# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| In re<br><br>ROBERT R. FAUTZ,<br><br>                    **Debtor**<br>―――――――――――――――――<br>BOB WEISS,<br><br>                    **Plaintiff**<br><br>v.<br><br>ROBERT R. FAUTZ,<br><br>                    **Defendant** | **Chapter 7**<br>**Case No. 16-10153-FJB**<br><br><br><br><br><br><br>**Adversary Proceeding**<br>**No. 16-1093** |

## <u>MEMORANDUM OF DECISION</u>

### 1.  Overview

By the two counts in this adversary proceeding, the plaintiff seeks a determination that a judgment debt owed him by the defendant chapter 7 debtor is excepted from discharge by operation of 11 U.S.C. § 523(a)(2)(A) and (a)(4).  On the basis of the following findings of fact and rulings of law, I conclude that the plaintiff has met his burden of establishing the requirements of nondischargeability under subsection (a)(2)(A) as to the entirety of the judgment debt but has failed to carry his burden under subsection (a)(4).

### 2.  Procedural History

On January 19, 2016, Robert R. Fautz ("Fautz" or the "Debtor") filed a petition for relief under chapter 7 of the Bankruptcy Code. In the case thereby commenced, Fautz has received a discharge under 11 U. S. C. § 727(b).  By his amended complaint in the present adversary proceeding, Robert Weiss ("Weiss" or the "Plaintiff") seeks a determination that his judgment debt against Fautz is excepted

from this discharge.  In Count I of the amended complaint, under § 523(a)(2)(A), Weiss contends that the

state court judgment (the "Judgment") is excepted from discharge as one for money obtained by a false

representation: specifically, that to induce Weiss to invest $150,000 in the corporation they were

forming, Fautz represented and promised that he would invest no less than $450,000 in the venture,

when in fact he never intended to invest more than $150,000.  And in Count II of the amended

complaint, under 11 U.S.C. § 523(a)(4), Weiss contends that the same judgment debt is further excepted

from discharge as one for fraud while acting in a fiduciary capacity and for defalcation while acting in a

fiduciary capacity.  The defalcation in this count appears to consist of alleged misappropriation and

squandering of the initial capital used to fund the corporation that the parties formed.  After a trial,

conducted remotely by video due to the public health emergency created by the Covid-19 pandemic,

the parties submitted proposed findings of fact and conclusions of law.  After closing arguments, Weiss

moved under Fed. R. Civ. P 15(b) to further amend the complaint to conform to the evidence adduced at

trial.  Fautz has opposed that motion.  I begin with deciding the motion to further amend the complaint.

### 3.  Motion to Amend Complaint to Conform to the Evidence

By this motion, Weiss moves to amend the Amended Complaint to conform to the evidence

adduced at trial.  The motion is vague in two respects.  First, nowhere in the body of this one-page

motion does Weiss specify how precisely he is seeking to amend the amended complaint.  However, he

did file with the motion a proposed second amended complaint, from which it appears that he is

requesting that the complaint be deemed amended to include a second basis for excepting part of the

judgment debt from discharge under subsection (a)(2)(A).  Specifically, the complaint would be

amended to allege that he made a $50,000 equity contribution in justifiable reliance on Fautz's

representation to him that the corporation's liquor license had been placed in Weiss's name, when in

fact this was false and Fautz knew it to be false.[1]  This is the only new basis for relief that I discern in the proposed second amended complaint.

The motion is also less than clear as to the basis of the relief it seeks.  The one-page motion cites only to Rule 15(a)(2) and (b) and advances arguments (though not much developed) under both the Rule 15(b)(1) and (b)(2) standards for amendment during and after trial.[2]  Notwithstanding this confusion, I think it clear enough that the motion is founded on Rule 15(b)(2). I reach this conclusion for three reasons.  First, the motion expressly states that it is being made under Rule 15(b), narrowing the possible bases for relief to its two subparts.  Second, the motion is being made after the close of the trial, and of the two subparts of Rule 15(b), only the second is a basis for amendment after the trial. And third, the motion expressly asks that the complaint be deemed amended to "conform to the evidence adduced at trial," which tracks the language of Rule 15(b)(2) (permitting a party to move at any

---

[1] The proposed second amended complaint also includes new allegations that Fautz falsely represented to Weiss that he had the financial wherewithal to contribute $450,000. However, these allegations do not appear in the section of the second amended complaint labeled Count I, which is otherwise quite detailed about the operative representations that form the basis of that count.  I therefore do not understand Weiss to be advancing these allegations as a new basis for relief under subsection (a)(2)(A).  If this was the Plaintiff's intent, the proposed amendment would in any event be futile.  A false representation concerning the debtor's financial condition could be a basis for nondischargeability only under subsection (a)(2)(B) and only if the representation were in writing. *See* 11 U.S.C. § 523(a)(2)(B) and the exception in subsection (a)(2)(A) ("other than a statement respecting the debtor's or an insider's financial condition").  The proposed second amended complaint does not allege that Fautz's false representations concerning his ability to fund an equity contribution of $450,000 were in writing, and no evidence of such a writing was adduced at trial.

[2] Rule 15(b) addresses amendments during and after trial.  It states:
  "(1) *Based on an Objection at Trial*. If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.
  (2) *For Issues Tried by Consent*. When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move – at any time, even after judgment – to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue."

time "to amend the pleadings to conform them to the evidence") and moves for the form of relief it

contemplates.

The parties' briefing of this motion leaves much to be desired.  Their arguments are like "two

ships that pass in the night."[3]

Under Rule 15(b)(2),[4] when an issue not raised in the pleadings is actually tried, the Court may

allow the amendment upon a finding that the opposing party consented, either expressly or impliedly,

to the issue's being tried.  Rule 15(b) is to be interpreted liberally to promote the objective of deciding

cases on their merits.  *See Brandon v. Holt*, 469 U.S. 464, 471 & n. 19 (1985).  "Federal Rule of Civil

Procedure 15(b) allows an unpleaded claim to be considered when the parties' conduct demonstrates

their express or implied consent to litigate the claim."  *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310,

319 (1st Cir. 2012).

The Court may find implied consent when the party whose consent is required has actively

engaged in, or silently acquiesced to, the trial of the amended claim.  *See Fustolo v. Patriot Grp., LLC (In

re Fustolo)*, 896 F.3d 76, 84 (1st Cir. 2018).  Implied consent may be found when opposing counsel fails

to object to the presentation of issues raised that are outside of the pleadings.  *Id.* (citing *Conjugal P'ship

v. Conjugal P'ship*, 22 F.3d 391, 400-01 (1st Cir. 1994)).  "However, the introduction of evidence directly

relevant to a pleaded issue cannot be the basis for a founded claim that the opposing party should have

realized that a new issue was infiltrating the case."  *Id.* (quoting *DCPB, Inc. v. City of Lebanon*, 957 F.2d

913, 917 (1st Cir. 1992)).  While the rule is to be construed liberally, the Court must protect the due

process rights of the opposing party and therefore may allow a late amendment only if the non-moving

party will not suffer undue prejudice.  *Id.* (citing *Campana v. Eller*, 755 F.2d 212, 215 (1st Cir. 1985)).

---

[3] Henry Wadsworth Longfellow, A Poem: Tales of a Wayside Inn (Houghton, Mifflin 1891).
[4] Fed. R. Civ. P. 15 is made applicable in adversary proceedings by Fed. R. Bankr. P. 7015

Fautz did not consent expressly to trial of the basis for relief that Weiss now advances.  Did he consent implicitly?  At trial, Plaintiff's counsel made numerous inquiries related to the ownership of the liquor license.  He asked Fautz about his representations regarding ownership of the license, Fautz responded to such inquiries, and Weiss clearly testified about his reliance on those representations.  Although specific allegations regarding the liquor license did not appear in the amended complaint, Fautz's attorney made no objection to them when raised in testimony.  This is the precise type of conduct that gives rise to the application of Rule 15(b)(2).  I find that the questions regarding the liquor license went beyond mere background or even credibility.  It was clear that the Plaintiff was attempting to establish that Fautz's representations concerning ownership of the liquor license satisfied the various requirements of a false representation under § 523(a)(2)(A).  In the absence of an objection, the Court finds that the Defendant impliedly consented to the trial of this new basis for relief.  *See generally Premier Cap., LLC v. Crawford (In re Crawford)*, 841 F.3d 1, 1-9 (1st Cir. 2016) (affirming the bankruptcy court's finding of implied consent when the plaintiff's complaint made general allegations of a false oath but the trial specifically referenced an omission of a Cash Balance Plan without objection).  The Court will treat the operative complaint as amended under Fed. R. Civ. P. 15(b)(2) to incorporate this new basis for relief.

### 4.  Findings of Fact

The parties first met in the summer of 2006 through a mutual acquaintance when Fautz was looking for someone to invest in a bar he was opening in the Lower East Side of Manhattan.  Prior to the parties' being introduced, Fautz had been presented with the opportunity to purchase a bar that was already in operation.  The bar was located at 210-214 Rivington Street in New York City.  Fautz planned to take over the space, renovate it, and open a bar called Revolver.  On August 4, 2006, Fautz established a corporation, Silver Revolver, Inc., by filing a certificate of incorporation with the New York Secretary of State; it was through Silver Revolver that he intended to operate Revolver.

Weiss had no previous experience investing in bars or restaurants; rather, he worked as an investment trader. Weiss testified that he had been interested in acquiring an ownership interest in a bar in his neighborhood and therefore was interested in the venture. Fautz had previously owned a "burger joint" and had been involved with operating at least one other bar. Fautz represented to Weiss that he had experience and success in the industry. Because he met Fautz through a mutual friend, Weiss did not perform any independent due diligence into Fautz.

Although Weiss testified that he was concerned because other establishments had failed in that location, he and Fautz initially agreed that Weiss would invest $100,000 in return for a ten percent interest in Silver Revolver. While hesitant, Weiss relied on Fautz's experience and enthusiasm in deciding to invest.[5] On July 30, 2006, four days after the initial agreement, Weiss stated that he was interested in investing even more than the initial $100,000, but in order to do so he wanted his name to be on the liquor license. Liquor licenses are valuable assets in New York City. Weiss believed that having the liquor license in his name would protect his overall investment. This arrangement with the license was the major contributing factor in Weiss's deciding to increase his investment by $50,000.

The parties set about to document their ownership agreement. On July 31st, the day after Weiss indicated his intent to increase his investment by $50,000, the parties executed a document called "Schedule A" to a proposed but not yet executed Shareholders Agreement, and Weiss delivered a deposit check of $10,000. The salient business details of their arrangement were set forth in the first version of the "Schedule A," which stated that Fautz would own ninety shares with a capital contribution of $600,000 and Weiss would own ten shares with a capital contribution of $100,000. Next, they moved forward on the work needed to finalize Weiss's further investment of $50,000. On August 18, 2006,

---

[5] In an email dated July 26, 2006, Weiss states: "Anyway, overall I think this is a risky proposition. The fact that the place may only have a 2 ½-3 year run and then it gets chopped up and sold is not very great odds. I like YOU though. You sound enthusiastic enough about the whole project, you are putting up money and you have club/bar experience." Exhibit 1.

Fautz sent an email to Weiss requesting information Fautz claimed was needed to put Weiss on the

liquor license. Weiss delivered a $90,000 check dated August 21, 2006 completing his initial investment.

Importantly, Weiss testified, and I found credible, that during this time the parties had communications

confirming they were the only shareholders of the corporation.  The Shareholders Agreement was later

finalized and executed on August 22, 2006.

On September 5, 2006, Fautz sent Weiss an email stating that Silver Revolver had received a

temporary liquor license that listed Weiss as co-owner and confirmed that Silver Revolver would be

signing the lease either Thursday or Friday of that week.[6]  Later that day the parties executed the first

amended "Schedule A," which dropped Fautz's capital contribution to $550,000 for eighty-five shares

and increased Weiss's contribution to $150,000 for fifteen shares.  Also that day, Weiss delivered a

$50,000 check to Fautz, completing his investment.  Months later, on November 11, 2006, the parties

executed a second and final amended "Schedule A," which further decreased Fautz's contribution to

$450,000.  The Shareholders Agreement itself, as opposed to the "Schedule A," was not amended after

its execution on August 22, 2006.

Fautz does not dispute that he never contributed the full $450,000 as contemplated in the

"Schedule A."  However, Fautz does dispute that, as Weiss testified, he stated the $450,000 would come

strictly in cash; rather, he testified that he didn't even have $450,000 in cash.  Fautz testified that he

planned to cover up to $150,000 in cash and make up the rest through other investors and through

"sweat equity."   He also testified that, in the end, he contributed around $141,000 in cash to the

venture, a far cry from $450,000 in cash.  Weiss, for his part, claims that he would never have invested

had he known that Fautz was not putting up hundreds of thousands of dollars in cash.  Weiss

---

[6] During this time, Fautz was also in negotiations with the current owner of the bar.  Fautz was attempting to
negotiate for an assignment of the lease, the liquor license, and the "key" for the property.  While the record is
unclear, it is enough to say that the landlord was unwilling to permit an assignment of the lease to Fautz, either
because he preferred a new lease with higher rent or because he had had prior dealings with Fautz that did not
instill confidence in him. Regardless of the reason, Fautz was not able to obtain a lease.

summarized his views as follows: "I'm never going to give anyone $150,000 and say here, go gamble with my money in a business, but if he's putting triple what I'm putting in, he's got skin in the game.  It was supposed to be there, and it was never put in." Tr. Vol. 2, p. 125.

Once he had keys in hand,[7] Fautz began substantial renovations in order to build the space into a "lounge" rather than "a gin mill."  This work was performed by an individual named Joseph John Giampa ("Giampa"), who had had previous discussions with Fautz about his investing in Silver Revolver. Giampa testified that he "built the entire place out" without compensation and believed that this was part of his investment in the bar.  Fautz testified that he was planning on giving Giampa twenty-five percent of his shares in exchange for $200,000 in renovations, and that this would cover $200,000 of his (Fautz's) promised capital contribution.  Nothing in the record suggests that this arrangement was ever formalized in writing, but Fautz testified that this resulted in Giampa being an "unofficial" major investor in the bar.  Weiss testified, credibly, that he was not aware of these agreements with Giampa at the time he made his investments.  Fautz did not testify otherwise.  At some point following the opening and after Weiss had delivered his checks, the bar's manager informed Weiss that Giampa was also an investor in the venture.  This disclosure began a downward spiral in the relationship between Fautz and Weiss.

Weiss and Fautz exchanged numerous emails after Weiss learned that Giampa was an investor. When Weiss questioned Giampa's role in the venture, Fautz responded that they needed to discuss Weiss's role in the bar.  Fautz stated defensively: "This project was funded from day 1, I removed money to make you a part of it. . . I wasn't expecting eyes of (sic) my shoulders or a co-operator."  Fautz

---

[7] Although Fautz was not able to obtain an assignment of the lease he was able to enter into an agreement with the owner of the bar.  They agreed that, for a total sale price of $220,000, with $160,000 down and monthly payments of $2,400, Silver Revolver was given a "bill of sale" for the property.  Although unclear from the testimony, I understood this to mean that Silver Revolver had a right to occupy the premises.

followed up with a letter in which he explained that Silver Revolver had still not received full approval of

a liquor license and stated that Weiss's role was limited to that of a silent investor.

Silver Revolver operated from October 2006 until March 2007; it never turned a profit.  While

Fautz ran the bar, Weiss continued to attempt to understand the corporate structure of Silver Revolver,

including by making several requests for a meeting with Giampa.  Once the bar ceased operations, Fautz

attempted to sell the business, an effort that failed.  After a short period he simply turned the keys over

to the principal of Silver Revolver's sub-lessor, left the state of New York, and moved to Florida.

In September of 2007, Weiss sued Fautz and other entities, including Silver Revolver, in New

York state court.  The complaint stated counts against Fautz for breach of contract, fraud in the

inducement, and unjust enrichment.  On June 5, 2009, Weiss obtained a default judgment against Fautz

in the amount of $150,000 plus interest at the statutory rate from August 21, 2008 and attorney's fees

in the amount of $3,000 (the "New York Judgment").  The principal amount of the judgment, $150,000,

was based on the amount of Weiss's investment in Silver Revolver.

Weiss initially domesticated the New York Judgment in the state of Florida, to which Fautz had

moved.[8]  Seven years later, Fautz also domesticated the judgment in the Massachusetts Superior Court,

which, on September 22, 2015, issued a new, Massachusetts judgment in the amount of $285,000 plus

statutory interest from May 14, 2015 and costs (the "Massachusetts Judgment").

**5.  Jurisdiction**

The matter before the Court is a complaint under 11 U.S.C. § 523(a) to determine the

dischargeability of a debt.  The matter arises under the Bankruptcy Code and in a bankruptcy case and

therefore falls within the jurisdiction given the district court in 28 U.S.C. § 1334(b) and, by standing

order of reference, referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a).  It is a core

proceeding. 28 U.S.C. § 157(b)(2)(I) (core proceedings include determinations as to the dischargeability

---

[8] Neither the Florida judgment nor evidence of its terms has been introduced into evidence.

9

of particular debts).  This court accordingly has authority to enter final judgment in the matter.  28

U.S.C. § 157(b)(1).

### 6.  Conclusions of Law and Analysis

Under the Bankruptcy Code's fresh start policy, the requirements for a discharge are liberally

construed in favor of the debtor.  *See Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997) (quoting

*Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987)).  All genuine doubts should be resolved in

favor of the debtor. *Id.*  Further, a plaintiff bears the burden of production and the burden of proof

regarding every element of a § 523(a) claim.  *Id.* at 787.  "The standard of proof of each element of a §

523(a) claim is by a preponderance of the evidence."  *Id.*

### A.  11 U.S.C. § 523(a)(2)(A)

Subsection (a)(2)(A) excepts from discharge "any debt for money, property, services, or an

extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false

representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial

condition." 11 U.S.C. § 523(a)(2)(A).  Weiss contends that the judgment debt in question is a debt for

money obtained in its entirety by one false representation and in part by another.  The First Circuit has

articulated a six-element test to determine whether a debt was obtained by a false representation.  To

establish a false representation within the meaning of § 523(a)(2)(A), a plaintiff must prove:

> 1) the debtor made a knowingly false representation, or one made in
> reckless disregard of the truth, 2) the debtor intended to deceive, 3) the
> debtor intended to induce the creditor to rely upon the false statement,
> 4) the creditor actually relied upon the false statement, 5) the creditor's
> reliance was justifiable, and 6) the reliance upon the false statement
> caused damage.

*Dewitt v. Stewart (In re Stewart)*, 948 F.3d 509, 520 (1st Cir. 2020) (quoting *Sharfarz v. Goguen (In re*

*Goguen)*, 691 F.3d 62, 66 (1st Cir. 2012).  "A false representation is an express misrepresentation."  *See*

*McGuinness v. Gannon (In re Gannon)*, 598 B.R. 72, 82 (Bankr. D. Mass. 2019).

The second element, intent to deceive, may be found if,

> the maker of the misrepresentation (a) knows or believes that the matter
> is not as he represents it to be; (b) does not have the confidence in the
> accuracy of his representation that he states or implies; or (c) knows that
> he does not have the basis for his representation that he states or
> implies.

*Stewart*, 948 F.3d at 523 (quoting *Palmacci*, 121 F.3d at 787). The relevant inquiry is the debtor's state of mind at the time the representation was made, and, where the representation is a promise, whether the representation was made with either "an intention of reneging on his promise or recklessly disregarding whether or not he would keep his promise." *Id.* A trier of fact may infer the requisite intent or recklessness if, based on the totality of the circumstances, the debtor knew or should have known that he was unable to keep his promise. *Id.* The mere failure to subsequently perform a promise or contractual obligation does not make a debt non-dischargeable if the debtor had a good faith intent to keep his promise. *Id.* "A dumb but honest defendant does not satisfy the test of scienter." *AT&T Universal Card Servs. Corp. v. Searle*, 223 B.R. 384, 390 (Bankr. D. Mass. 1998) (quoting *Palmacci*, 121 F.3d at 788).

The final four elements embody the requirement that the creditor's claim must arise directly from the debtor's fraud. *See McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001). The test under § 523(a)(2)(A) requires that the creditor's reliance have been justifiable. *See Fields v. Mans*, 516 U.S. 59, 70 (1995). "Reliance is justifiable if the falsity of the representation would not have been readily apparent to the person to whom it was made." *Atlantic Trade LLP v. Aung (In re Zaw Aung)*, 611 B.R. 145, 154 (Bankr. D. Mass. 2020) (citing *Fields*, 516 U.S. at 70); *See also Farley v. Romano (In re Romano)*, 353 B.R. 738, 768 (Bankr. D. Mass. 2006) ("Justifiable reliance, a critical element of proof under § 523(a)(2)(A), requires only that the falsity of the representation not be obvious to someone of the plaintiff's knowledge and intelligence."). A person can be justified in relying on a representation even if an investigation would have led to the falsity being discovered. *Fields*, 516 U.S. at 70. The court should

not reward a debtor for his fraud merely because the creditor could have performed an investigation

without any considerable trouble or expense.  *Sanford Inst. for Sav. v. Gallo*, 156 F.3d 71, 75-76 (1st Cir.

1998).  The Supreme Court has made it clear that justifiable is a lesser standard than reasonable but

further stated that its reading did "not leave reasonableness irrelevant."  *Fields*, 516 U.S. at 76.  "Naïfs

may recover, at common law and in bankruptcy, but lots of creditors are not at all naïve.  The

subjectiveness of justifiability cuts both ways, and reasonableness goes to the probability of actual

reliance."  *Id.*  Lastly, the creditor must show a direct link between the debtor's misrepresentation and

the creation of the debt at issue.  *See Aoki v. Atto Corporation (In re Aoki)*, 323 B.R. 803, 816 (B.A.P. 1st

Cir. 2005) (citing *Spigel*, 260 F.3d at 32 n. 7, 35). The statutory language of § 523(a)(2)—"any

debt . . . for money . . . to the extent obtained by . . . a false representation"—encompasses and excepts

from discharge any liability arising from money that is obtained by a false representation, including

treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor.

*Cohen v. de la Cruz*, 523 U.S. 213, 223, 118 S. Ct. 1212, 1219, 140 L. Ed. 2d 341 (1998).

Weiss relies on two false representations to except the debt owed to him from Fautz's discharge

under § 523(a)(2)(A): first, that Fautz made a false representation when he stated, numerous times, that

he would be contributing $450,000 or more into the business; and second, that Fautz falsely

represented to him that Weiss's name was on the liquor license. I will take each in turn.

### i.  Fautz's Intent to Invest

Weiss argues that Fautz's debt should be excepted from discharge under § 523(a)(2)(A) because

Fautz falsely represented to him that he would be investing at least $450,000 in Silver Revolver.  I make

the following findings regarding this alleged false representation.

As to the first of the six requirements of a false representation, that the debtor have made a

knowingly false representation, Weiss has satisfied his burden of proof.  The parties executed not one

"Schedule A," but three that stated Fautz would be investing no less than $450,000.  The ordinary import

of the words used was that Fautz himself would invest cash in this amount, not that he intended to raise

capital from himself and others in the stated amount or that some portion of his contribution might be

sweat equity.  Throughout the initial interactions between Fautz and Weiss, Weiss testified, and I find

him credible, that Fautz never hinted that other individuals would be contributing to the equity of Silver

Revolver.  Weiss understood that Fautz intended to invest cash of no less than $450,000, and Fautz

knew that he was creating this understanding in Weiss. The representation, a promise of investment of

$450,000, was false, and Fautz knew it to be so each time he made it.  Fautz never intended to

contribute more than $150,000 in cash, and he never did so.  Fautz himself testified that he would never

have been able to make such a large investment; rather, he planned to invest around $150,000 in cash

while arranging for up to $200,000 to be contributed in the form of Giampa's renovations.  (Even taken

together, $150,000 from Fautz and $200,000 from Giampa would still have fallen materially short of the

promised $450,000.)

Weiss has also carried his burden as to the second and third requirements: intent to deceive

and intent to induce reliance.  Fautz made his representations that he would invest no less than

$450,000 with intent to deceive Weiss.  His intent to deceive is underscored by his conduct.  Fautz

worked hard to hide his arrangement with Giampa from Weiss.  He repeatedly told Weiss that they

would be the only investors in the business; then he asked Weiss not to attend the grand opening, a

gathering that included Giampa.  I find that Fautz's repeated statements about the ownership of the bar

and the amount of his capital contribution were made with intent to deceive and to induce Weiss to

invest in Silver Revolver.

Weiss has further carried his burden as to the fourth and fifth requirements, that the creditor

actually relied upon the false statement, and that this reliance was justifiable.  As Weiss credibly

testified, he relied on Fautz's representation about the extent of his intended investment when deciding

to invest his own money.  Weiss would not have made any of his investment, either the first $100,000 or

the subsequent $50,000, had he not thought that Fautz also had "skin in the game." Moreover, Weiss's reliance was reasonable. Weiss had no reason not to take Fautz's representations at face value; his deceit was not readily apparent. The standard of justifiable reliance placed Weiss under no obligation to investigate, but it is unclear how he might have investigated had he wanted to. Only Fautz knew and could have known that he did not intend to honor his promise. Weiss has established that his reliance was justifiable. *Field v. Mans*, 516 U.S. at 70-72, 116 S.Ct. at 443-44 (reliance is justifiable if the falsity of the representation would not have been readily apparent to the person to whom it was made).

Weiss has also carried his burden as to the sixth requirement: that the reliance upon the false statement caused damage. Weiss was damaged in that, in reliance upon the false representation, he was induced to make both his initial investment of $100,000 and his subsequent investment of $50,000. He was thus parted with $150,000 of his funds, which is damage to him.

Weiss having thus satisfied each of the six requirements, I conclude that Fautz's representation concerning the extent of his intended investment was a false representation within the meaning of § 523(a)(2)(A). By this false representation, Fautz obtained $150,000 for Silver Revolver, Inc., and this $150,000 is money obtained by a false representation within the meaning of § 523(a)(2)(A). The principal amount of the New York Judgment was based on Weiss's loss of the $150,000 obtained by a false representation. The full amount of that judgment, including the interest, costs, and attorney's fees awarded therein, constitutes a debt for money obtained by a false representation and accordingly is excepted by § 523(a)(2)(A) from discharge. *Cohen v. de la Cruz*, 523 U.S. at 223, 118 S. Ct. at 1219. The Massachusetts Judgment (including without limitation the interest, costs, and attorney's fees awarded therein) being a domestication of the New York Judgment, is also, in its entirety, a debt for money obtained by the same false representation and accordingly is excepted by § 523(a)(2)(A) from discharge. *Id*.

### ii. Representation as to Liquor License

As an additional basis for excepting a portion of the same debt from discharge under subsection (a)(2)(A), Weiss alleges that Fautz made another false representation, this time as to ownership of the liquor license, to induce Weiss to increase his investment in Silver Revolver by $50,000.  As to this alleged false representation, I find that Weiss has carried his burden as to each of the six requirements of a false representation

On July 30, 2006, Weiss told Fautz that he was potentially interested in investing additional funds, provided his name was placed on the liquor license.  Weiss believed this would protect his investment. Fautz agreed to those terms and sent an email requesting certain information so that Weiss could be added to the liquor license.  About a month later, after Weiss had made his initial contribution, but prior to the parties' execution of the amended "Schedule A," which increased Weiss's investment by $50,000, Fautz informed Weiss that Silver Revolver had in fact obtained a temporary liquor license and that Weiss was listed as a co-owner.  This statement was untrue.  Silver Revolver never received a temporary or permanent liquor license; and Weiss's name was never on any liquor license under which the bar was operated.  Fautz knew his statement to be untrue when he made it, and he made it to induce Weiss to invest the additional $50,000.  The facts support a finding that Fautz intended to deceive Weiss for two reasons.  First, Fautz knew that Weiss's next advance of $50,000 was conditioned on the liquor license's being put in Weiss's name.  Second, Fautz knew that Weiss was made confident in making this further investment because of the liquor license.  Plainly, the liquor license was an inducement to convince Weiss to increase his investment.  Weiss relied on the false representation by investing an additional $50,000; he would have been unwilling to make the further investment without the security afforded by the license's being in his name.  Weiss's reliance on Fautz's statement as to the liquor license was justifiable; Silver Revolver needed a liquor license to operate, and Weiss did not know Fautz's representation to be false.  Weiss's reliance on the representation caused him damage in that he

made his second investment, of $50,000, on the basis of the representation; and when the business

failed, he did not have the benefit of the liquor license as security and lost his entire investment.

Weiss having thus satisfied each of the six requirements, I conclude that Fautz's representation

that Weiss's name had been placed on the liquor license was a false representation within the meaning

of § 523(a)(2)(A). By this false representation, Fautz obtained $50,000 for Silver Revolver, Inc., and this

$50,000 is money obtained by a false representation within the meaning of § 523(a)(2)(A). The principal

amount of the New York Judgment was based in part, a one-third part, on Weiss's loss of this $50,000

obtained by a false representation. Accordingly, I find that one-third of the amount of that judgment,

including the interest, costs, and attorney's fees awarded therein, constitutes a debt for money

obtained by a false representation and, on the basis of this representation, is excepted by § 523(a)(2)(A)

from discharge. *Cohen v. de la Cruz*, 523 U.S. at 223, 118 S. Ct. at 1219. The Massachusetts Judgment

(including without limitation the interest, costs, and attorney's fees awarded therein) being a

domestication of the New York Judgment, is also, to the extent of one-third thereof, a debt for money

obtained by the same false representation. Accordingly, on the basis of this false representation, it is

excepted by § 523(a)(2)(A) from discharge to the extent of one third of the amount due thereunder. *Id.*

### B.   11 U.S.C. § 523(a)(4)

Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a

fiduciary capacity." 11 U.S.C. § 523(a)(4). Weiss alleges that Fautz's misrepresentation of his intent to

contribute at least $450,000 to the project constitutes both fraud and defalcation while acting in a

fiduciary capacity. He also alleges that Fautz misappropriated and squandered the initial capital of Silver

Revolver and that this constitutes both fraud and defalcation while acting in a fiduciary capacity.

Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a

fiduciary capacity." 11 U.S.C. § 523(a)(4). The phrase "while acting in a fiduciary capacity" modifies both

fraud and defalcation. It follows that whether the basis is fraud or defalcation, a debt is excepted from

discharge by subsection (a)(4) only if the fraud or defalcation that gave rise to the debt was committed

"while acting in a fiduciary capacity."

The threshold issue is whether the debtor was acting in a fiduciary capacity. Weiss contends

that Fautz was acting in a fiduciary capacity in each instance because he was acting as the majority

shareholder and director of a small, closely-held corporation, Silver Revolver, and therefore had

fiduciary duties to Weiss as a minority shareholder in the corporation.

Whether a debtor is acting in a fiduciary capacity within the meaning of § 523(a)(4) is a matter

of federal law. *Raso v. Fahey (In re Fahey)*, 482 B.R. 678, 688 (1st Cir. BAP 2012); *In re McBride*, 512 B.R.

103, 113 (Bankr. D. Mass. 2014); *see also Tudor Oaks Ltd. P'ship v. Cochrane (In re Cochrane*), 124 F.3d

978, 984 (8th Cir. 1997).

> The term applies only to relationships arising out of express or technical
> trusts, and not to trusts that are implied in law as a remedy. As a result,
> the existence of [a] fiduciar[y] dut[y] alone does not establish fiduciary
> capacity for purposes of § 523(a)(4), although most courts today
> recognize that the technical or express trust requirement is not limited to
> trusts that arise by virtue of a formal trust agreement, but includes
> relationships in which trust-type obligations are imposed pursuant to
> statute or common law.

*In re Romano*, 353 B.R. at 761; *see also Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934);

*Rutanen v. Baylis (In re Baylis)*, 313 F.3d 9, 17 n.3 (1st Cir. 2002). "The elements of an express

trust have traditionally included an explicit declaration of trust, a clearly defined trust res, and

an intent to create a trust relationship." *Levitsky v. McPherson (In re McPherson)*, 564 B.R. 6, 18

(Bankr. D. Mass. 2017) (citing *Fahey*, 482 B.R. at 687). Technical trusts arise from a statute or

common law. *See Id.* Technical trusts do not include "a trust which the law implies from a

contract or a trust imposed as a remedy for wrongdoing." *MacPherson v. Marano (In re*

*Marano)*, 568 B.R. 723, 730 (Bankr. D. Mass. 2017) (citing *Davis*, 293 U.S. at 333)). The definition

is construed narrowly but can be informed by principles of state law. *Romano*, 353 B.R. at 688.

In previous cases involving Massachusetts entities, I have held that members in a limited

liability company and shareholders in a close corporation were acting in a fiduciary relationship

as that term is used in § 523(a)(4).  *See Reiss v. McQuillin (In re McQuillin)*, 509 B.R. 773, 788

(Bankr. D. Mass. 2014) and *Integrated Pharm., Inc. v. Chatterjee (In re Chatterjee)*, 594 B.R. 15

(Bankr. D. Mass. 2018), both applying Massachusetts law.

Here, the parties do not dispute that the corporation was formed under New York state

law.  "[C]ases following New York law have in fact found a fiduciary relationship sufficient to

meet the threshold question of § 523(a)(4)."  *Rothman v. Beeber (In re Beeber)*, 239 B.R. 13, 32

(Bankr. E.D.N.Y. 1999) (citing *Ferraro v. Phillips (In re Phillips)*, 185 B.R. 121, 129-30 (Bankr.

E.D.N.Y. 1995); *First Nat'l Bank of Boston v. Overmyer (In re Overmyer)*, 52 B.R. 111, 118 (Bankr.

S.D.N.Y. 1985)).  I therefore conclude that, after the formation of Silver Revolver, Fautz had

fiduciary obligations to the corporation and, once Weiss became a shareholder, to Weiss as a

shareholder.

This does not end the inquiry.  "The exception to discharge applies to fiduciaries only

while they are acting in a fiduciary capacity."  *In re Baylis*, 313 F.3d 9, 17 (1st Cir. 2002).  In other

words, the act that gave rise to the debt must relate to a person (akin to the beneficiary of an

express trust) and assets (akin to the res of an express trust) within the scope of the debtor's

fiduciary obligations.  In addition, "the relationship must exist prior to the act creating the debt

and without reference to the act."  *M-R Sullivan Mfg. Co., Inc. v. Sullivan (In re Sullivan)*, 217 B.R.

670, 675 (Bankr. D. Mass. 1998) (citing *Carlisle Cashway, Inc. v. Johnson (In re Johnson)*, 691 F.2d

249, 252 (6th Cir. 1982); *see also Baker v. Friedman* (*In re Friedman)*, 298 B.R. 487, 497 (Bankr. D.

Mass. 2003) (citing *In re Frain*, 230 F.3d 1014 (7th Cir. 2000)).

The meaning of defalcation has at its core the misappropriation of money held in a

fiduciary capacity and the failure to account for any such monies.  *Whittaker* v. *Whittaker (In re*

*Whittaker)*, 564 B.R. 115, 140 (Bankr. D. Mass. 2017), citing *Stowe v. Bologna (In re Bologna)*, 35

206 B.R. 628, 633 (Bankr. D. Mass. 1997) ("Black's Law Dictionary defines 'defalcation' as '[t]he .

. . act of embezzling; . . . misappropriation of trust funds or money held in any fiduciary capacity;

failure to properly account for such funds").  However, the dictionary definitions also

encompass, more broadly, "default," "failure to meet an obligation," and "monetary deficiency

through breach of trust": that is, any monetary deficiency resulting from a breach by a trustee of

his or her fiduciary obligation.  *Whittaker*, 564 B.R. at 141.  Provided there exists the necessary

level or type of intent, risk, or scienter (about which more below), defalcation encompasses any

breach of fiduciary duty that results in a monetary deficiency. *Id.*

    The Court of Appeals has further made clear that "[i]nherent in 'defalcation' is the

requirement that there be a breach of fiduciary duty; if there is no breach, there is no

defalcation." *Baylis*, 313 F.3d at 17.

    In addition, "defalcation requires some degree of fault, closer to fraud, without the

necessity of meeting a strict specific intent requirement . . . something close to a showing of

extreme recklessness."  *Baylis*, 313 F.3d at 18, 20.  A defalcation requires a breach of fiduciary

duty.  *Id* at 17; *see also Chatterjee*, 594 B.R. at 30.  Reckless conduct demonstrating that the

fiduciary disregarded or is "willfully blind to a substantial risk that his conduct will turn out to

violate a fiduciary duty" has led to a finding of defalcation.  *Ackerman v. Ackerman (In re

Ackerman)*, 587 B.R. 750, 786 (Bankr. D. Mass. 2018) (citing *Bullock v. BankChampaign, N.A.*, 569

U.S. 267, 273-74 (2013)).  The risk "must be of such a nature and degree that...its disregard

involves a gross deviation from the standard of conduct that a law-abiding person would

observe in the actor's situation." *Id.*  "A defalcation may be presumed from a breach of the duty

of loyalty." *In re Chatterjee*, 594 B.R. at 30.

i.   **Obtaining Weiss's Investments**

Weiss first argues that Fautz committed both fraud and defalcation by obtaining Weiss's

investments in the manner that he did, that is, by making misrepresentations to him about the

amount that Fautz would invest into the business and about Weiss's name being on the liquor

license.  Whether the predicate act is viewed as fraud or defalcation, Weiss must prove that it

was committed by Fautz *in a fiduciary capacity*.  For the following reasons, he has not satisfied

that requirement.[9]

Only when Weiss made the first of his two investments, the investment of $100,000.00,

did he become a shareholder in Silver Revolver and complete the process of creating the

fiduciary relationship—the relationship of a controlling shareholder to a minority shareholder in

a closely held corporation—on which he relies.  It follows that when the alleged acts of fraud

and defalcation were committed—the making of false representations and inducement of

reliance that eventuated on Weiss's initial investment—the fiduciary relationship did not yet

exist. And during the period prior to the investment, the monies at issue, the $100,000 that

Weiss invested, remained Weiss's property.  These funds were not property of the corporation

and were neither held nor controlled by Fautz at all, must less as a fiduciary.  No technical trust

existed during the acts that gave rise to this first investment.

By the time of the acts of fraud or defalcation that resulted in Weiss's second

investment, Weiss had become a shareholder, but not with respect to the new $50,000 that

constituted that investment.  As to this second tranche, Weiss was a prospective investor, not

yet a shareholder.  When the acts that constitute the alleged fraud and defalcation as to this

second investment were committed, the monies that were the subject of these acts remained

---

[9] I need make no determination as to whether the acts by which Fautz obtained Weiss's two investments
constituted either fraud or defalcation within the meaning of § 523(a)(4) and accordingly make no rulings on those
issue.

property of Weiss.  Accordingly, even though a fiduciary relationship existed between Weiss and

Fautz for some purposes, that relationship did not pertain to or encompass the funds at issue.  I

conclude that the tripartite relationship needed to establish a technical trust—the relationship

of trustee to beneficiary with respect to a *res*—did not exist for lack of a *res* held under a

fiduciary obligation.  It may also be that the fiduciary obligations that ran from Fautz to Weiss

for some purposes did not extend to Fautz in his negotiation of new investment from this

existing shareholder, but I need make no ruling on that issue.  It is enough that as to this second

tranche, the monies at issue did not yet belong to the corporation and were not held by Fautz in

any capacity.

It makes no difference that, as a consequence of the alleged fraud and defalcation, the

monies at issue became assets of the corporation and from that point forward were held by

Fautz as a fiduciary.  The statute expressly requires that the fraud and defalcation have been

committed "*while* acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4).  Here, the acts at issue

cannot be said to have occurred while Fautz was acting in a fiduciary capacity.

Weiss has not argued that, as a consequence of the acts at issue, the monies thereby

obtained for the corporation were impressed with a resulting trust—a form of remedial trust—

for Weiss's benefit.  To supply the necessary fiduciary capacity, Weiss relies solely on the

relationship of controlling shareholder to minority shareholder.  But the resulting trust theory

would not aid Weiss's case.  In *Davis*, the Supreme Court stated, "It is not enough that, by the

very act of wrongdoing out of which the contested debt arose, the bankrupt has become

chargeable as a trustee *ex maleficio*.  [The debtor] must have been a trustee before the wrong

and without reference thereto." 293 U.S. at 333.  While this statement is arguably *dictum,* other

Courts, including this one, have adopted it as one of the main principles of § 523(a)(4).  *See Bd.*

*of Trs. of the Ohio Carpenters' Pension Fund on Behalf of the Ohio Carpenter's Pension Fund, et.*

*al. v. Bucci (In re Bucci)*, 493 F.3d 635, 642 (6th Cir. 2007) ("We made clear in *In re Johnson* that

"the requisite trust relationship must exist prior to the act creating the debt and without

reference to it.") (citing *Johnson*, 691 F.2d at 252); *Fowler Brothers v. Young (In re Young)*, 91

F.3d 1367, 1372 (10th Cir. 1996) (citing *Allen v. Romero (In re Romero)*, 535 F.2d 618, 621 (10th

Cir. 1976)); *Evans v. Pollard (In re Evans)*, 161 B.R. 474, 477 (B.A.P. 9th Cir. 1993) (citing *Ragsdale

v. Haller* 780 F.2d 794, 796 (9th Cir. 1986)); *Feldman v. Kaufman (In re Kaufman)*, 85 B.R. 706,

710 (Bankr. S.D.N.Y. 1988); *Sullivan*, 217 at 675.

I conclude that the acts by which Fautz obtained Weiss's investments for the

corporation were not committed while in a fiduciary capacity, and the resulting judgment debt

is accordingly not excepted from discharge by subsection (a)(4).

### ii.  What Fautz Did with the Investments

Weiss also argues that the debt should be excepted from discharge under § 523(a)(4)

because Fautz misappropriated and squandered the initial capital used to fund the bar and

thereby committed both fraud and defalcation while acting in a fiduciary capacity.  This

argument fails for two reasons.

First, the debt in issue is a judgment debt, and the judgment was not for the conduct

complained of here.  The complaint stated counts against Fautz for breach of contract, fraud in

the inducement, and unjust enrichment.  Each was based on the manner in which Fautz

obtained Weiss's investments, and the measure of damages was the extent of the ill-gotten

investment.  No part of the judgment was predicated on acts committed by Fautz with the

monies he obtained from Fautz for the corporation.  Accordingly, the judgment debt is not a

debt for the conduct complained of here, as subsection (a)(4) requires.   11 U.S.C. § 523(a)(4)

(excepting from discharge "any debt *for* fraud or defalcation while acting in a fiduciary

capacity").

Second, Weiss has failed to prove that Fautz committed the acts that he contends constitute the alleged fraud and defalcation. Weiss contends first that Fautz misappropriated the funds he invested, but Weiss produced no evidence of misappropriation. Nothing in the record suggests that the first $100,000 did not go into the bar. As for the last $50,000, it is true that the check was made out to Fautz personally, but there is no evidence in the record that the funds were not invested in the business.

Weiss also alleges that Fautz committed fraud and defalcation by squandering the corporation's initial capital. There is no question that the business of Silver Revolver failed, that this failure was the result of business decisions by Fautz, and that it resulted in loss of the entire capitalization of the corporation. However, the record does not reflect that Fautz did not attempt, in good faith, to get the bar off the ground. In fact, the record demonstrates that Fautz did put a lot of work into creating what he hoped would be a successful business. The record makes clear that the location of the bar made it extremely challenging. Bad business decisions, without more, do not arise to the level necessary to demonstrate a defalcation of one's fiduciary duty. The business would have lasted longer had Fautz capitalized it to the extent that he promised he would, but there is no evidence that undercapitalization was the cause of the failure, or that the capitalization that Fautz promised would have been the difference between failure and success. There is nothing in the record to show that Fautz's actions in managing the business were egregious or a "gross deviation from the standard of conduct that a law-abiding person would observe," *Bullock,* 569 U.S. at 274 (defining the level of fault required for a defalcation within the meaning of subsection (a)(4)), much less that they constituted fraud in any sense.

Weiss has not met his burden under § 523(a)(4).

**7.  Conclusion**

Weiss has met his burden of proving that his judgments against Fautz are, in their

entirety, excepted from discharge under § 523(a)(2)(A).  Though he has failed to meet his

burden of showing that the same debt, or any portion of it, is also excepted from discharge

under § 523(a)(4), it is enough that he has prevailed under subsection (a)(2)(A) as to the entirety

of the debt at issue.  Accordingly, judgment shall enter in favor of Weiss, declaring the judgment

debts excepted from discharge.


Date:    January 10, 2022

Hon. Frank J. Bailey
United States Bankruptcy Judge